## ·Case No: 12,614.

### SEDGWICK v. LYNCH.

[Nowhere reported; opinion not now accessible.]

## Case No. 12,615.

### SEDGWICK v. LYNCH.

[5 Ben. 489;[1] 8 N. B. R. 289.]

District Court, S. D. New York.     Feb., 1872.[2]

BANKRUPTCY—SALES OUT OF ORDINARY COURSE OF BUSINESS—PRICES RECEIVED—INSOLVENCY.

1. V. & Co. were wholesale grocers, having, also, retail stores. On December 12th, 1868. they suspended payment, owing debts to the amount of $150,000. On November 13th and 23d, and December 2d, they sold goods, at their wholesale store, to L., to the amount, in all, of $12,-021.50, which were paid for by him in cash, at the time. L. was not in the grocery business, and bought the goods at a low price. V. & Co. having been adjudged bankrupts, their assignee brought suit against L., to set aside the sales and recover the property or its value. The suit was based on the 35th section of the bankruptcy act [of 1867 (14 Stat. 534)]. *Held,* that there was nothing about the sales that could be alleged to have been out of the usual and ordinary course of business, except in regard to price.

2. This fact of low prices, under the circumstances, was not sufficient to characterize the sales as out of the usual and ordinary course of business.

3. Although the debts of V. & Co. were maturing so fast, in comparison with their receipts from debts due them and ordinary sales, that, having exhausted their powers of borrowing, they were resorting to sales at a sacrifice, still there was nothing to show that they had not reasonable cause to believe that. by these sacrifices, they would weather the storm, except the fact that they suspended payment so soon, and three days after filed a petition as voluntary bankrupts; and this fact did not show that they were then insolvent or contemplating insolvency.

[This was a bill in equity by John Sedgwick, assignee in bankruptcy of Abraham and James S. Valk against John Lynch.]

T. M. North, for plaintiff.

W. Fullerton and D. N. Rowan, for defendant.

BLATCHFORD, District Judge: On the 15th of December, 1868, Abraham Valk and James S. Valk filed a petition in voluntary bankruptcy in this court. They were grocers. The plaintiff is their assignee in bankruptcy, and files this bill to set aside, as fraudulent, certain sales of groceries made by them to the defendant, three in number. The first sale was made on the 13th of November, 1868, and comprised 150 chests of tea, 6,300 pounds, at 45 cents per pound, $2,835.00; 60 bags of coffee, 9,600 pounds, at 13½ cents per pound, $1,296.00; 12 boxes of sugar, 5,400 pounds, at 9½ cents per pound, $513.00; 60 barrels of whiskey, 2,640 gallons, at 70 cents per gallon, $1,848.00; 25 casks of sherry, $500. The second sale was made on the 23d of November,

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court. Case unreported.]

1868, and comprised 3,730 pounds of tobacco, at 45 cents per pound, $1,678.50; 25 barrels of whiskey, 1,027 gallons, at $1 per gallon, $1,027.00; 12 chests of tea, 540 pounds, at 60 cents per pound, $324.00. The third sale was made on the 2d of December, 1868, and comprised 20,000 pounds of sugar, at 10 cents per pound, $2,000.00. The amount of the first sale was $6,992.00; of the second sale, $3,029.-50; of the third sale, $2,000.00; and of the aggregate of all, $12,021.50. The bill alleges, that the sales were made in fraud of the creditors of the bankrupts, and in fraud of the provisions of the bankruptcy act; that the bankrupts, being insolvent, and in contemplation of insolvency and bankruptcy, made the sales; that, at the time the sales were made, the defendant had reasonable cause to believe the bankrupts to be insolvent, or to be acting in contemplation of insolvency, and that the sales were made with a view to prevent their property from coming to their assignee in bankruptcy, or to prevent the same from being distributed under the said act, or to defeat the object of, or in some way to impair, hinder, impede or delay the operation and effect of, or evade some of the provisions of, the said act; that the sales were not made in the usual and ordinary course of business of the bankrupts; and that the sales were void under the provisions of the said act, and passed to the defendant no title to the property sold, as against the plaintiff. The bill prays that the sales may be decreed to be, as to the plaintiff, null and void; that the property sold may be decreed to have vested in the plaintiff, as such assignee, as against the defendant; that the plaintiff, as such assignee, may be decreed to recover the property, or the value thereof, from the defendant; and that the defendant be decreed to deliver to the plaintiff, as such assignee, all of the property remaining in his hands, and to pay to the plaintiff the value of so much thereof as may have been disposed of by him.

The bankrupts suspended payment on the 12th of December, 1868, owing debts to the amount of $150,000. In addition to a wholesale store in New York, they had had eight retail stores in New York, Brooklyn and Newark. The usual amount of their stock at their wholesale store was from $50,000 to $75,000. During the month before their failure $93,-000 were paid by them to their creditors, and during the month before that $60,000. In their wholesale business they sold goods for cash and on time, to any one who came to purchase, and bought in large quantities from manufacturers, importers and jobbers. They failed, after having made all the efforts they could to collect the debts that were due to them, and they failed because they did not collect such debts. They also made all the sacrifices they could to meet their liabilities, struggling not to fail. They borrowed no money for the two months next preceding their failure. but made their payments out of moneys collected from debtors, and moneys

received for goods sold for cash, and moneys received as the discount of notes taken for retail stores of theirs which they sold. Down to the 12th of December they met all their payments as they became due. Just before their failure money was worth from three-eighths of one per cent. per day to three-quarters of one per cent. per day, and they sold goods at a sacrifice for cash, to meet their liabilities, in preference to paying such rate of interest, as being actually less wasteful of money. The defendant was not the only person to whom they sold goods at a sacrifice for cash. They paid one of their creditors in goods, and to another they turned out four of their retail stores and other goods. On the 26th of October, they sold their other four retail stores, to raise money. All the money which they obtained from all these sources was paid to their creditors. Before their failure, they had disposed of most of their wholesale stock, besides their retail stores. The goods sold to the defendant were paid for by him in cash at the time. They were purchased at the wholesale store, and taken away by him to a place of storage provided by him. He sold the goods, through a broker, to four or five different purchasers. He was, at the time, in the jewelry business, and had been in it about a year and a half. The account the defendant gives of his purchases is this: "I lend money on all kinds of personal property. Mr. Moore came to me, and wanted me to buy some notes belonging to Valk Brothers. He said they were very short, there was a panic in money, he could buy this paper very cheap, it was good, and they were a firm of 17 or 18 years' standing. I told him I would not buy their notes, but, if they had stock such as he said, tea, sugar, &c., I would buy that, if they would sell it cheap enough. He took me over there, and I bought some tea, sugar, &c. I bought three times. My motive in buying was to make money on it. It was no loan to them. I bought it for myself and for my own profit, not with money borrowed from them, or that came from them. I thought there was 15 or 20 per cent. margin of profit on it. My wife and son carry on the jewelry business. I have been in the habit of dealing in foreign fruit and liquors, and have speculated off and on for twenty-five years in tea, coffee and rice. At the time I bought these goods, I was interested as a silent partner in two cellars under Washington Market, used for storing and selling goods." The defendant endeavored to sell the goods he bought, in one lot, to a grocer, for $14,000, telling where he had bought them, and what they had cost. Their market value was from $16,000 to $17,000. He sold to one person 145 chests of the tea at 67½ cents a pound, and the wine and whiskey at $1 a gallon. The same person offered him 18 cents a pound for the coffee, and 11 cents a pound for the sugar, but bought none of either. The defendant sold 23,575 pounds of sugar, less 2½ per cent. for tare, at 11½ cents a pound. The person who bought the tea at 67½ cents testifies that its market value was from 77 to 80 cents, when bought by the defendant; that the market value of the coffee was 17½ cents per pound, when bought by the defendant; that the market value of the whiskey was $1.25 per gallon, when bought by the defendant; and that the tobacco was worth from 45 to 50 cents per pound.

This suit is founded on that provision of the 35th section of the bankruptcy act which enacts that, if any person, being insolvent, or in contemplation of insolvency, within six months before the filing of the petition by him, makes any sale of any part of his property to any person who then has reasonable cause to believe him to be insolvent, or to be acting in contemplation of insolvency, and that such sale is made with a view to prevent his property from coming to his assignee in bankruptcy, or to prevent the same from being distributed under said act, or to defeat the object of, or in any way impair, hinder, impede or delay the operation and effect of, or to evade any of the provisions of, said act, the sale shall be void, and the assignee may recover the property, or the value thereof, as assets of the bankrupts; and that, if such sale is not made in the usual and ordinary course of business of the debtor, the fact shall be prima facie evidence of fraud.

It is contended, for the plaintiff, that these sales to the defendant were not made in the usual and ordinary course of business of the bankrupts. There was nothing that can be alleged to have been out of such usual and ordinary course except in regard to price. The sales were sales at wholesale, made by wholesale dealers, at their wholesale place of business, in view of the goods, and accompanied by manual delivery of the goods, which were paid for in cash at the time. They were sales out of a large stock of goods, and not sales of an entire stock or business. With all these indicia of a regular and ordinary business transaction to a purchaser, it will not do to say that the mere fact of sales at such low prices as those in this case makes them sales out of the usual and ordinary course of business of the sellers, and so prima facie evidence of fraud. If so, who would be safe from having a purchase made by him far below cost, at an auction sale, or a closing out sale, or what is often advertised as a selling off below cost, from being brought up against him as prima facie evidence of a fraud against the bankruptcy act? The business of a purchaser is to buy as cheaply as he can. Many men relieve themselves from temporary embarrassment, when money is dear, by sacrificing property at low prices, to meet their obligations. Such acts are often praiseworthy and successful, and much to be preferred for their own interests, and those of their creditors, to the incurring of new obligations at exorbitant rates of interest. To apply the doctrine contended for in this case would stamp such transactions

as fraudulent on their face, because, being sales below cost, they were, therefore, out of the usual and ordinary course of business of the sellers, although attended by all the other usual accompaniments of sales in market overt.

The sellers in this case were not insolvent, or acting in contemplation of insolvency, when the sales were made, in the sense of the statute. They were meeting their obligations as they matured, curtailing their business by disposing of their retail stores, and not contemplating suspension, but doing everything to avert it. They used the moneys derived from these sales to pay maturing debts in the usual course of business. It is true, that their maturing debts were coming around so fast, in comparison with their receipts due them and ordinary sales, that, having exhausted their power of borrowing, they were resorting to sales at a sacrifice. But there is nothing to show that they had not, when these sales to the defendant were made, reasonable cause to believe that, by these sacrifices, they would weather the storm, except the fact that, twenty-nine days after the first sale, nineteen days after the second sale, and ten days after the third sale, they gave up the struggle and suspended payment, and three days thereafter came into this court as voluntary bankrupts. It may be conceded that it would have been better for those who were their creditors when they petitioned, if they had suspended payment some time before they did; but that by no means shows that they were, within the statute, insolvent or contemplating insolvency, when they made these sales.

Of course, the defendant could not have reasonable cause to believe that which did not exist. Under the views suggested, the sales were not made by the bankrupts with a view to prevent the goods sold from coming to their assignee in bankruptcy, or from being distributed under the act, or to defeat the object of the act, or impair, hinder, impede or delay its operation or effect, or evade any of its provisions.

The present case is not unlike that of Lee v. Hart, 28 Eng. Law & Eq. 531. In that case, Peters, the bankrupt, commenced business as a retail draper in August. For several months subsequently he purchased large quantities of goods. In November, he commenced selling them to the defendant, who was a job dealer, and continued to do so from time to time, at prices stated to be about forty or fifty per cent. below cost. The following April, Peters stopped payment, and eleven days afterwards was declared a bankrupt. The defendant had paid the bankrupt about £1,800 in respect of goods which were stated to be worth about £3,000. The assignees of the bankrupt sued the defendant, in trover, for converting the goods. Evidence was given tending to show that the bankrupt was insolvent during the time he was making the sales, from time to time, to the defendant. For

the plaintiffs, it was contended, that the sales amounted to an act of bankruptcy, as being a fraudulent transfer of goods within the statute. The plaintiffs had a verdict, at the sittings. On a motion for a new trial before the court of exchequer, Baron Parke says: "Without doubt, there may be a sale which is a fraudulent transfer, within the meaning of the bankrupt act. That is established by the case of Cook v. Caldecot, 4 Car. & P. 315, Moody & M. 522. Lord Tenterden there says: 'A sale is a transfer, and therefore may come within the provisions of the statute, as a fraudulent transfer.' For example, it would be a fraudulent act, if a party were to buy goods of another at a very low rate, knowing him at the same time to be in insolvent circumstances, and to have an intention of decamping with the money. What is meant as constituting an act of bankruptcy is a direct fraud on creditors, but not a mere selling of goods at a price below their value. That is the meaning of the case of Cook v. Caldecot." A new trial was granted and had. At the second trial it appeared that Peters set up business in September, beginning by obtaining a large stock of goods on credit; that, in November, the defendant bought some goods of Peters for about half their real value; that, after that, and up to the following April, between twenty and thirty similar transactions took place, the sales being always at less than two-thirds of the real value of the goods; that the bankrupt said that he applied the moneys received from the defendant in paying creditors; that Peters became bankrupt in April; and that his failure arose from his thus selling the goods at such low prices. At the trial, the court directed the jury that, if the transactions between the defendant and Peters were real sales, the one bargaining for the price, the other for the goods, each endeavoring to do the best for himself, the sales were not acts of bankruptcy. The jury found for the defendant. After judgment, the plaintiffs carried the case, by writ of error, to the exchequer chamber. In affirming the judgment, the court say (Lee v. Hart, 34 Eng. Law & Eq. 569): "We are of opinion, in this case, that the direction of the judge to the jury is correct, and that, if the jury were of opinion, on the evidence before them, that the dealings between the defendant and the bankrupt, which were in question, were real sales by the bankrupt to the defendant, each trying to make the best bargain he could for himself, such sales were not acts of bankruptcy, or fraudulent transfers of the bankrupt's goods, within the meaning of the" statute enacting, "that, if any trader liable to become bankrupt shall 'make or cause to be made any fraudulent gift, delivery or transfer of any of his goods or chattels,' every such trader so doing, with intent to defeat or delay his creditors, shall be deemed to have thereby committed an act of bankruptcy." "The statute does not mention 'sales' as one of the fraudulent modes by which an act of bankruptcy may be committed; but the

sale of goods at a low rate may be a fraudulent transfer, if the seller did not intend to sell the goods bona fide for the purpose of carrying on his business, but for the purpose of defeating and delaying his creditors. To that effect is Lord Tenterden's decision in the case of Cook v. Caldecot, which was much relied upon by the counsel for the plaintiff, and observed upon by the court of queen's bench, in Baxter v. Pritchard, 1 Adol. & E. 456. Neither of these cases, nor that of Graham v. Chapman, 21 Law J. (N. S.) C. P. 173, nor Young v. Waud, 8 Exch. 221, will apply to a case like the present, where the bankrupt sold goods at various times to the defendant at very low rates, for the purpose, as it would appear by the evidence, not of defeating or delaying the creditors, but of distributing the proceeds among them, and to enable him to carry on the business longer. The sales were bona fide sales, though they were at less prices than the goods were worth, and it does not appear that, at the time of each sale, or of any of them, the bankrupt could have obtained better prices for ready money, which seems to have been his object."

In the present case, the evidence that, at the time the goods were bought by the defendant, their market value was the prices stated in excess of those paid by the defendant, does not make the sales fraudulent. In the case of Lee v. Hart, the goods were sold at two-thirds and one-half of their "real value." It is not shown, in the present case, that the bankrupts could or ought to have obtained more for the goods, on sales of them for cash, than they did. The presumption is, that, with the object which it is proved they had in view—to get all the money they could to pay to their creditors—they would sell for the highest prices they could obtain, in their position. While it was open to them to borrow money or sell their notes, it might have been far from judicious, in its effects on their credit as merchants, for them to sell goods at all at auction, or for them to sell to others in the trade, even through brokers, at low prices; while they might deem it not injurious to sell at such prices to a purchaser like the defendant. There is an entire absence of evidence that they could or ought, in the then existing state of things, to have obtained more for the particular goods sold to the defendant; and, still further, of evidence to charge the defendant with reasonable cause to believe anything which involves him in complicity with what the statute declares to be a fraud. I cannot believe that the statute intends to throw such serious embarrassments in the way of ordinary trade as would arise if such sales as those to the defendant were held to be void. The bill must, therefore, be dismissed, with costs.

NOTE. The circuit court (Woodruff, J.), in affirming this decision, on appeal, in March, 1873, said: "This case seems to me one of much doubt, but, upon the best consideration I can give to the proofs, my conclusion is, that it is not sufficiently proved that the defendant, when he purchased the goods in question, had reasonable cause to believe that the sellers (Valk Brothers) were insolvent, and, also, that they made the sale in fraud of the bankrupt act, in the particulars mentioned in the 39th section. Nor is it proved that the sale was so out of the usual course of business of the debtors, as to raise a presumption of such fraud, which the explanation of the transaction given by the parties does not repel. The decree must be affirmed, with costs." [The opinion of the circuit court is nowhere more fully reported.]